# IN THE COURT OF APPEALS OF IOWA

No. 26-0097
Filed April 15, 2026

**In the Interest of M.B., B.E., and K.H., Minor Children,**

**D.H., Father,**
Appellant,

**J.B., Mother,**
Appellant.

Appeal from the Iowa District Court for Polk County,
The Honorable Susan Cox, Judge.

**AFFIRMED ON BOTH APPEALS**

Aaron H. Ginkens of Ginkens Law Firm, P.L.C., West Des Moines,
attorney for appellant father.

Sandra C. Johnson of Cunningham & Kelso, P.L.L.C., Urbandale, attorney
for appellant mother.

Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney
General, attorneys for appellee State.

Chira Corwin, Des Moines, attorney and guardian ad litem
for minor child K.H.

Nicole Garbis Nolan of Youth Law Center, Des Moines, attorney and guardian ad litem for minor children M.B. and B.E.

_____

Considered without oral argument
by Greer, P.J., and Schumacher and Chicchelly, JJ.
Opinion by Greer, P.J.

**GREER, Presiding Judge.**

A mother appeals the termination of her parental rights to three children: M.B. (born 2009), B.E. (born 2014), and K.H. (born 2024). Each child has a different father.[1] The father appeals the termination of his parental rights to the youngest child, K.H. On our de novo review, we affirm the termination of their parental rights as there was clear and convincing evidence establishing the grounds for termination given the parent's respective circumstances and their collective inability to have custody returned to them at the time of the termination trial.

## I. Background Facts and Proceedings.

Most recently, the family came to the Iowa Department of Health and Human Services' (HHS) attention due to concerns that the mother was living with a sex offender, the youngest child's father, and letting the sex offender take care of the children while she was at work.[2] There were additional allegations of physical abuse against the oldest child and failure to provide mental-health care for the oldest child. Previously, HHS was involved with the family because the mother had allowed a registered sex offender access to her children, resulting in harm. *See In re A.C.*, No. 18-2045, 2019 WL 1958603, at *1 (Iowa Ct. App. May 1, 2019) (noting the

---

[1] M.B.'s father's parental rights were terminated in these proceedings, and he does not appeal. B.E.'s father previously had his parental rights terminated. When we use "father" in this opinion, we are referring to K.H.'s, the youngest child, father. The mother also has an older child with a different father that is not part of these proceedings. We refer to that child as "the oldest sibling." The father also has an older child, but his parental rights to that child were terminated in another, earlier proceeding.

[2] The youngest child was not born until a few months after this case began.

mother did not protect two of her children from sexual contact with men who abused them—one of which was B.E.'s father).

Throughout the course of these proceedings, the mother instigated a relationship with B.E.'s father, who had sexually abused the oldest sibling. His rights were terminated in 2019. The mother then reconnected with the oldest sibling's father, who was on parole for sexually abusing a teenager, allowing him unlimited access to the children involved in this appeal. Ultimately, it was revealed he was sexually grooming B.E. and M.B., his parole was revoked, and he was sent to prison. M.B. also reported that another one of the mother's boyfriends sexually abused her. In all these situations, the mother demonstrated a lack of protective capacity for the children from the sexual offenders she associated with over the years.

In August 2024, before the youngest child was born, a child protective worker (CPW) contacted the mother, who admitted having an ongoing relationship with the father. But, at first, the mother denied that he had ever spent the night in her home or met her children. In September, the CPW met with the mother and children at the home. The oldest child reported that the father had been staying in the home, and that he was alone with them while the mother worked. Although the children reported the father had never done anything that made them feel uncomfortable, it was learned that the mother "attempted to bribe [the middle child] to not say anything prior to" the CPW's arrival. A few days later, with the help of law enforcement, the CPW confirmed through family members that the father had been staying in the home, and eventually, the mother admitted that not only he did stay there, but that he was alone with the children.

Given these safety concerns, the juvenile court ordered the children to be temporarily removed from the mother's custody, under the supervision of

HHS. The State filed child-in-need-of-assistance (CINA) petitions for the two older children. In October, the court entered a removal order and adjudicated the two older children CINA under Iowa Code section 232.96A(3)(b), (4), and (14) (2024). In December, the youngest child was born and temporarily removed a few days after birth "due to ongoing mental health, home hygiene, lack of protective capacities, and healthy relationship concerns." It was also noted that the mother was still in contact with the father, despite the safety concerns. The State filed a CINA petition as to the youngest child, who was removed from the mother's custody and adjudicated CINA under Iowa Code section 232.96A(3)(b) and (14) (2025).

Following institution of the CINA proceedings, the father "was arrested and charged with violation of sex offender registration and two counts of child endangerment." In January 2025, the father was incarcerated and the mother pled guilty to child endangerment, an aggravated misdemeanor.

In November, the court held a permanency hearing. The father testified that he was granted parole and in December would be entering a work release program, and that he had completed several courses while incarcerated. He was only offered and participated in one virtual visit with the youngest child while incarcerated. Where the father was incarcerated, there was no private setting for the visits, and because the visits would have had to occur in the presence of other sex offenders, HHS suspended the visits.

After the permanency hearing, the State petitioned to terminate the mother's and father's parental rights. In December, a termination hearing was held and the HHS social work case manager testified that the mother "continued [a] history of exposing her children to sex offenders, [and]

5

lack[ed] the protective capacities to know who safe people are for her children to the extent that even with a year of services, she has maintained a relationship with [the father]." The case manager further opined that the mother "still does not believe he presents a danger to her children." The case manager testified that at the time of the permanency hearing the mother did not take "responsibility for her lack of protective capacities" and continued "regular, consistent, and frequent contact with" the father. The mother failed to sufficiently accomplish goals set by HHS and, in addition to the safety concerns, "[t]here were also a plethora of concerns about hygiene in the home and care for pets." Though the mother made some home improvements between the permanency and termination hearing, HHS still did not consider the home safe by the time of the termination hearing, noting it would take "several months of work to just try to establish one safe room in the home." Additionally, the mother prevented all three of the children from attending necessary services, such as medical and mental-health appointments.

As to the father, the HHS social case worker testified K.H. could not be returned to his custody at the time of the termination hearing because he "lack[ed] insight as to how his actions that led to his placement on the sex offender registry present dangers to children." And there were other concerns that the father could not be a safe caregiver, including issues with his mental health. After the father was released from prison, he did not alert HHS or contact them to establish visitation with K.H., so he had not even had regular contact with the child.

In a twenty-seven-page ruling, the juvenile court detailed its findings and conclusions and terminated the mother's rights under Iowa Code section 232.116(1)(f) for the two older children and terminated the mother's

and father's rights to the youngest child under section 232.116(1)(h). The mother and father separately appeal.

## II. Standard of Review.

We review termination-of-parental-rights cases de novo. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *Id.* (cleaned up). Our primary concern is the best interests of the children. *In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014).

## III. Analysis.

We apply a three-step analysis when reviewing the juvenile court's decision to terminate parental rights, asking whether (1) a statutory ground for termination is satisfied, (2) the child's best interests are served by termination, and (3) a permissive exception applies and should be exercised to preclude termination. *See In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022); *see also* Iowa Code § 232.116(1)–(3). We address each parent's appeal separately. *See In re J.H.*, 952 N.W.2d 157, 171 (Iowa 2020).

**A. Mother's Appeal.** On appeal, the mother challenges the statutory grounds for termination and argues that she should have been given an additional six months to work toward reunification. She also alleges termination is not in the children's best interests and an exception to termination applied based on the strength of the parent-child bond.

1. *Statutory grounds for termination.* The termination provisions under section 232.116(1)(f) and (h) are identical except for the child's age and length of time removed from the parent's custody. *See* Iowa Code § 232.116(1)(f), (h). The mother recognizes this similarity and in her

argument under section 232.116(1)(h) states that her "analysis set forth . . . under section 232.116(1)(f) applies equally to section 232.116(1)(h) and is incorporated herein by reference." The mother only challenges the fourth element of both sections, that "at the present time" the children could not be returned to the mother's custody. "At the present time means at the time of the termination hearing." *In re R.M.-V.*, 13 N.W.3d 620, 626 (Iowa Ct. App. 2024) (cleaned up).

In her argument under section 232.116(1)(f), the mother claims that the evidence failed to:

> meet the standard of clear and convincing to show that the child[ren] could not be safely returned to [the] mother at the end of a six-month period. . . . It's possible that the mother may have been able to reunite with her children at the end of a six-month extension.

But, the mother does not argue that the children could be returned to her custody at the time of the termination hearing. Thus, we find a statutory ground for termination satisfied under Iowa Code section 232.116(1)(f) and (h). *In re M.R.*, No. 25-1414, 2025 WL 3171421, at *2 (Iowa Ct. App. Nov. 13, 2025) (rejecting a parent's challenge to the evidence supporting the grounds for termination section 232.116(1)(f) in part because "contending that the children could be returned to either parent's custody within the next six months does not support the [parent]'s challenge to the fourth element, as the relevant time in determining whether section 232.116(1)(f)(4) has been established is the time of the termination trial").

Even if we did not reject the mother's challenge to the statutory grounds, we would affirm on this issue. At the time of the hearing, the primary issue for removal—the mother's "inability to be protective or have the children be protected from sex offenders"—had not been resolved. The HHS social work case manager testified that "to this day" the mother had

"not developed insight as to how [the father] presented a danger to her children." Given this lack of insight and the mother's history with sex offenders, there was risk of increased danger to the children. Thus, the mother's home was not safe for the children. Though the mother was only supposed to have contact fully supervised by HHS with the children, she messaged the children "almost daily" for a time. The mother has a history of instructing the children to not tell professionals about unsafe situations as she blamed them for reporting that the father was in the home. As an additional problem, the mother failed to address the children's mental-health concerns. As the case manager reported at the termination hearing, "[HHS] has no confidence that [the mother] can be safe, appropriate, or protective if left to her own devices without very structured supports in place when she can't even do that now." We find clear and convincing evidence shows that grounds for termination exist under Iowa Code section 232.116(1)(f) and (h).

2. *Best interests.* In our best-interests analysis, we primarily consider "the child's safety, . . . the best placement for furthering the long-term nurturing and growth of the child, and . . . the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). We look to the parent's past performance as it may indicate the quality of care the parent might provide heading into the future. *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006).

The mother has a history of engaging in relationships that are dangerous to her children. As noted by the juvenile court, "[t]he goal of [the mother] working with a specialized therapist was to understand why she continues to choose unsafe men and why they were unsafe. Instead of working on that goal, [the mother] chose to work on how to continue her relationship with [the father]."

Despite a year of services by the time of the termination hearing, the mother failed to recognize the harm to the children, all the while continuing a relationship that exposed the children to danger. The HHS case worker testified that it was in all the children's best interests to have the mother's parental rights terminated. Now, the children are living in stable homes in their current foster placements, who allow sibling contact, and are doing well. Considering the children's immediate and long-term best interests, we find they deserve stable and safe caretakers who can protect them. The termination of the mother's parental rights is in the best interests of all three children.

3. *Six-month extension.* For the same reasons detailed above, we decline the mother's request for an additional six months to work toward reunification. *See* Iowa Code § 232.104(2)(b) (noting the juvenile court may grant a six-month extension of time to work toward reunification only if it "determin[es] that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period"). Given the mother's history of repeatedly placing her children in unsafe situations and her lack of awareness of the danger to the children, we cannot find that the need for removal will no longer exist in six months. *See J.H.*, 952 N.W.2d at 171 (considering a parent's past performance in determining the child's best interests "because it may indicate the quality of care the parent is capable of providing in the future" (citation omitted)). Even at the time of the termination hearing, with the father newly released from prison, the mother was having "ongoing, and frequent contact" with him. The HHS case manager indicated the mother "does not respect any safety constructs or constraints." We cannot make the children wait for their mother to recognize how to safely care for them.

4. *Parent-child bond.* The mother also argues that an exception applies under Iowa Code section 232.116(3)(c) because of the closeness of the parent-children bond. She maintains termination would be detrimental to the children. Iowa Code section 232.116(3)(c) provides an exception when "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." The burden rests on the mother to prove an exception by clear and convincing evidence that the disadvantage to the children from termination would be more detrimental than the mother's proven inability to safely care for their needs. *See In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018). Under this section, grounds that preclude termination are permissive and not mandatory. *In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014).

We agree with the juvenile court that an exception to termination should not apply in this case. The mother contends that her bond with each of the children should prevent termination. After over a year of services, however, the mother has continued her relationship with the father, a sex offender, despite the danger this poses to the children. The mother's argument related to her relationships with the children seems hollow given her inability to consider their safety. Considering our primary concern is the best interests of the children, we decline to use this exception.

**B. Father's Appeal.** On appeal, the father challenges the statutory grounds for termination to K.H., that he should have been given an additional six months to work toward reunification, and HHS failed to make reasonable efforts. He also alleges termination is not in the child's best interests.

1. *Statutory grounds for termination.* The father only challenges the fourth element under section 232.116(1)(h), that the child could not return to

his custody at the time of the termination hearing.[3] *See R.M.-V.*, 13 N.W.3d at 626 ("At the present time means at the time of the termination hearing." (cleaned up)). As noted by HHS, the child could not be returned to the father's custody at the time of the termination hearing because he had failed to gain insight on how his actions that resulted in his sex-offender status were dangerous to children. At the time of the termination hearing, the father had only been released from prison for a short time. For the majority of K.H.'s life, the father was incarcerated. It was also noted there were concerns about his ability to care for the child and his own mental health. Upon our review, we find clear and convincing evidence that the child could not have been returned to the father's custody at the time of the termination hearing. Thus, we affirm the juvenile court on this issue.

2. *Best interests.* In analyzing the child's best interests, we consider "the child's safety, . . . the best placement for furthering the long-term nurturing and growth of the child, and . . . the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). The HHS social worker testified that termination would be in the child's best interests as the child needs to "form secure attachments to caregivers" and the father has a "risk of recidivism to perpetrate again" as a sex offender. He was only released from prison shortly before the termination hearing and has a history of entering relationships with women who have young children and then endangering those children. Even with that history, at the November

---

[3] The father attempts to argue that his rights should not have been terminated in part because the children could have been returned to the mother at the time of the termination hearing. But, the father "does not have standing to assert" that the children could have been returned to the mother's care "in an effort to reverse the termination of [his] parental rights." *In re P.R.K.*, No. 18-0218, 2018 WL 1633526, at *2 (Iowa Ct. App. Apr. 4, 2018).

permanency hearing the father testified that his sex-offender treatment had been successful, but there is no track record supporting that statement. The child has been removed from parental custody for over a year and in that time the father has failed to gain insight into how his actions are dangerous to children. *See J.H.*, 952 N.W.2d at 171 (noting a parent's past performance is indictive of the future quality of care that parent can provide). Thus, we find that termination of the father's parental rights is in the best interests of the youngest child.

3. *Reasonable efforts.* Under Iowa Code section 232.102A(1)(a), "'Reasonable efforts' means the efforts made to preserve and unify a family prior to the out-of-home placement of a child in foster care or to eliminate the need for removal of the child or make it possible for the child to safely return to the family's home." When HHS is making reasonable efforts the "child's health and safety shall be the paramount concern." *Id.* While HHS must make reasonable efforts, "parents have a responsibility to object when they claim the nature or extent of services is inadequate." *In re L.M.*, 904 N.W.2d 835, 839–40 (Iowa 2017). Parents should object early to ensure that adequate changes can be made. *Id.* at 840. "In general, if a parent fails to request other services at the proper time, the parent waives the issue and may not later challenge it at the termination proceeding." *Id.* Here, the father only requested visitation nearly a year after the child's removal and one month before the permanency hearing was set and again at the permanency hearing. The juvenile court found that reasonable efforts had been made with respect to the father's visitation with the child. Even if the father properly preserved his challenge of HHS's reasonable efforts, we would find that HHS made reasonable efforts given the difficulty with visitation because of the father's incarceration—a self-imposed status.

After the paternity test results were known in August 2025 establishing the father's paternity to K.H., and until October, the father exercised one virtual visit with the child. The father argues that he was denied personal visits with the child despite his requests for additional visitation. We note that the father's request was for "video visitation" when he was incarcerated. During that incarceration period, HHS was concerned about the child's safety as there was not a private room for video visits to occur with the child. Tellingly, after his release from prison, the father did not reach out to HHS to attempt an in-person visit and, in fact, never even notified HHS he was released. While visitation is important to work toward reunification, "the nature and extent of visitation is always controlled by the best interests of the child." *In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996). Given the circumstances, we conclude that reasonable efforts were made.

4. *Six-month extension.* The father's argument for a six-month extension fails for the reasons identified above. From shortly after birth, the child has been removed from parental custody and in that time the father has failed to gain insight into how he poses a danger to children. From our review of the record, we cannot determine that the need for removal will not exist in six months, a requisite to grant an extension. *See* Iowa Code § 232.104(2)(b).

## IV. Conclusion.

Upon our de novo review, we affirm the termination of the mother's parental rights to all three children and the termination of the father's parental rights as to the youngest child as the State established by clear and

convincing evidence the grounds for termination and that termination was in the children's best interests.

**AFFIRMED ON BOTH APPEALS.**